IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ROBERT DICKERSON,

       Petitioner,

v.                         Case No. 2:07-cv-00415

TERESA WAID, Warden,
Huttonsville Correctional Center,

       Respondent.

**PROPOSED FINDINGS AND RECOMMENDATION**

This matter is assigned to the Honorable David A. Faber, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  On July 2, 2007, Petitioner filed a handwritten "Petition for a Writ of Habeas Corpus" with exhibits (docket sheet document # 2), and a "Memorandum in Support of Petition" (# 3).  On August 31, 2007, pursuant to the undersigned's Order, Petitioner filed a form Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (# 10).  The undersigned will collectively refer to documents ## 2 and 10 as "Petitioner's section 2254 petition" or "Petitioner's federal petition."

**PROCEDURAL HISTORY**

During the May 2004 term, Petitioner was indicted by a Kanawha County grand jury on one count of Operating or Attempting to

Operate a Clandestine Drug Laboratory (Case No. 04-F-162). (# 14, Ex. 1). Following a jury trial that took place on December 13-14, 2004, Petitioner was found guilty of the charge contained in the indictment.[1] (Id., Ex. 2). By Order entered March 2, 2005, the Circuit Court of Kanawha County sentenced Petitioner to two to ten years in state prison, with 254 days of credit for time served as of February 25, 2005. (Id.)

On July 14, 2005, Petitioner, by counsel, filed a Petition for Appeal of his conviction and sentence to the Supreme Court of Appeals of West Virginia (the "SCAWV"), raising the following grounds for relief:

1.    The trial court erred by failing to give defendant's instruction No. 1, which clearly defined the elements of attempt depriving Robert Dickerson of his due process right to have a properly instructed jury.

2.    The evidence at trial was insufficient to convict Dickerson of Operation of [sic; or] Attempt to Operate a Clandestine Drug Laboratory because there was no evidence of an overt act towards the operation of a clandestine drug laboratory.

(Id., Ex. 3). The SCAWV refused the Petition for Appeal on October 6, 2005. (Id.) Petitioner did not file a petition for a writ of certiorari in the Supreme Court of the United States.

On February 9, 2006, Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Kanawha County (Case No. 06-

---

[1]    This was Petitioner's second trial in that matter. The first trial ended in a mistrial.

2

MISC-55).  (Id., Ex. 4).  In that petition, Petitioner raised the following grounds for relief:

> A.  Petitioner was deprived of his due process right to have a properly instructed jury decide his case.
>
> B.  The trial evidence was insufficient to convict Mr. Dickerson of the charge of operating or attempting to operate a clandestine drug lab.
>
> C.  Evidence was gained through an unconstitutional search and seizure.
>
> D.  Petitioner was denied effective assistance of Counsel.
>
> E.  The trial court erred in overruling the Defendant's Motion to Suppress state's exhibits 6-35, respectively & consecutively . . .
>
> F.  The trial court erred by allowing state's exhibit # 35, a brown powder (methamphetamine) to be entered as trial evidence for the reasons that follow[.]

The Circuit Court denied that petition on March 1, 2006.  (Id.) Petitioner's petition for appeal from the denial of that habeas corpus petition was due in the SCAWV no later than July 1, 2006. (Rule 3(a), Rules of Appellate Procedure, SCAWV).  No such petition was filed.

Five months later, on December 1, 2006, Petitioner filed a Petition for a Writ of Habeas Corpus under the original jurisdiction of the SCAWV.  (Id., Ex. 5).  That petition raised the following grounds for relief:

> 1.  The trial court erred by refusing to give the jury "Defendant's Instruction # 1," which clearly defines "attempt," an essential element of the offense charged, depriving Mr. Dickerson of his due process right to have a properly instructed jury.

3

2.    The trial court erred by failing to instruct the
      jury as to all [the] essential elements of the
      crime, to wit, "operating or attempting to
      operate."

3.    The trial court erred by giving instructions to the
      jury that were confusing, & misleading.  These
      instructions would also allow the jury to conclude
      by presumption the essential element of "attempt,"
      one element of the crime charged, "operating or
      attempting to operate" a clandestine drug lab.

4.    The trial evidence was insufficient to convict Mr.
      Dickerson of "operating or attempting to operate" a
      clandestine drug lab, as there was no testimony or
      evidence offered by the State of an "overt act"
      toward the operation of a clandestine drug lab.

5.    The trial court erred by allowing state's exhibit #
      35, a brown powder (methamphetamine) to be entered
      as trial evidence for the reasons that follow[.]

6.    The trial court erred by overturning defendant's
      motion to suppress the several state's exhibits
      numbered respectively & consecutively State's
      exhibits 6 thru 35 conclusive, for the reasons that
      follow[.]

7.    The trial court was incompetent, by rulings of the
      federal courts of the United States, as well as the
      West Virginia Supreme Court of Appeals, by color,
      code, & conduct of the law.

The SCAWV refused that petition on January 10, 2007.  (Id.)

      Petitioner then filed the instant section 2254 petition on

July 2, 2007 (# 1), asserting the following grounds for relief:

1.    The trial court erred, by refusing to give
      defendant's instruction # 1 to the jury.

2.    The trial court erred, by failing to properly
      instruct the jury as to all the essential elements
      of the crime charged.

3.    The trial court erred by giving instructions to the
      jury which were confusing, misleading, and which

4

>          would allow, by presumption, the essential element
>          of "attempt."
>
>     4.   The trial evidence was insufficient to support a
>          conviction for the crime charged in this case.
>
>     5.   The trial court erred, by allowing specifically,
>          state's exhibit # 35, to be entered as trial
>          evidence.
>
>     6.   The trial court erred, by allowing into trial
>          evidence the exhibits marked respectively &
>          consecutively as, "state's exhibits 6-35"
>          conclusive.
>
>     7.   The trial court was incompetent, by rulings of the
>          West Virginia Supreme Court of Appeals, as well as
>          federal courts of the United States, by color, &
>          conduct of law.

(## 2 and 10).

On May 21, 2008, the presiding District Judge adopted the undersigned's Proposed Findings and Recommendation ("PF&R") finding that Petitioner's section 2254 petition was timely under 28 U.S.C. § 2244(d)(1).[2]  Accordingly, the presiding District Judge denied Respondent's Motion to Dismiss (# 14).  By separate Order entered on May 19, 2008, the undersigned ordered Respondent to file a response on the merits of the grounds for relief contained in Petitioner's section 2254 petition (# 21).

On July 30, 2008, after being granted an extension of time to respond, Respondent filed a Motion for Summary Judgment, with supporting exhibits (# 31), and a Memorandum of Law in support

_____

[2] Respondent initially filed a Motion to Dismiss the Petition as Untimely (# 14).

5

thereof (# 32).   On August 1, 2008, the undersigned entered an Order advising Petitioner of his right and obligation to file a response to Respondent's Motion for Summary Judgment, in accordance with the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) (# 33).   On August 29, 2008, Petitioner filed a Response to Respondent's Motion for Summary Judgment (# 34).   Respondent did not file a reply.   The matter is now ripe for determination.

## FACTUAL BACKGROUND AND TRIAL TESTIMONY

On June 6, 2003, the West Virginia Legislature enacted West Virginia Code § 60A-4-411, which states in pertinent part:

> (a)   Any person who operates or attempts to operate a clandestine drug laboratory is guilty of a felony and, upon conviction, shall be confined in a state correctional facility for not less than two years nor more than ten years or fined not less than five thousand dollars nor more than twenty-five thousand dollars, or both.
>
> (b)  For purposes of this section, a "clandestine drug laboratory" means any property, real or personal, on or in which a person assembles any chemicals or equipment, or combination thereof for the purpose of manufacturing methamphetamine, . . . .

W. Va. Code § 60A-4-411 (2003).   Petitioner was charged with a violation of this statute, after a search of a vehicle that he was driving on December 29, 2003, revealed a number of items that can be used to manufacture methamphetamine.   Those items will be discussed further infra.

As noted above, Petitioner's first trial ended in a mistrial. Prior to the first trial, Petitioner moved to suppress all of the

evidence seized from the truck he was driving, on the basis that the traffic stop and the alleged inventory search were not properly conducted.   The trial court denied the motion to suppress, making the following findings:

THE COURT: All right, let's begin with this search.  The search is an inventory search under the case law both here in the State of West Virginia and in U.S. Supreme Court cases.   It's my finding, first of all, that the stop which was made by this deputy was not an illegal stop but a legal one.  I base that finding on the facts elicited during the course of Ms. Lanham's testimony. She testified that on a previous occasion some months beforehand that there had been a shoplifting in the Go-Mart store where she worked, that this defendant was the person who committed that shoplifting.

There was testimony between her and the deputy which indicated that on the date of the shoplifting she provided a license plate number and a discrimination [sic; description] of the vehicle.  Although Ms. Lanham couldn't recall the description of the vehicle on the day of the shoplifting, she did recall that she saw this defendant driving a red S-10.  On a later day, that she provided a license number as well as a description of the vehicle to the officer.

The officer's recollection was that she provided a license number as well as a description of the vehicle on the date of the incident; that the license number was off by at least one number and did not come back to the vehicle.  He related that to her, and she subsequently gave him a license number after the person had revisited the store.

On a later occasion he saw the description of the vehicle, noting particularly the dent that was in the vehicle which had been described by Ms. Lanham, the license number, and stopped it.

I believe, and I find under the case law that this stop was legal for purposes of investigation.  He had knowledge that a person driving this vehicle with this license number had participated in a shoplifting on an earlier date.  So, I find that the stop in this case was

in fact a legal and proper stop.

After the vehicle was stopped, there was a request for license, there was a request for insurance and registration. Those items were not provided. And so, at that point in time the officer properly and under case law could place this gentleman under arrest. He could not indicate that he had an existing license. The testimony was that he indicated he had also been a resident of Florida. The officer testified he checked West Virginia and checked Florida, could not find an existing license in the name that was given to him.

He also testified that the car was registered in a name other than that which was given to him by the driver. So, the owner of the vehicle was not present. And I believe and I find, given the case law, inasmuch as there was no insurance, there was no proper registration or license provided, that this vehicle could properly be impounded once the defendant was arrested. The testimony was that he was arrested and he was placed in the deputy's vehicle.

Once the vehicle was impounded, under the case law there properly could be an inventory search. I find, given the evidence in this case, that there was no pretextual search here. The officers had no information that would cause them to do any type of pretextual search. This stop was for the purpose of investigating a shoplifting.

The officers testified that they did an inventory search in order to make sure that there was a list of the property in the vehicle before it was towed in order to protect the owner. The officer also testified that it was his policy, based on the instructions from his superiors, that under circumstances like this you would always impound. And he did impound; that he indicated that that was his consistent policy and that it had come from his superiors.

I find that the criteria for purposes of the inventory search have in fact been met. The vehicle was impounded. The officer indicated his policy, although, Mr. Dickinson, he did indicate that he couldn't say what the Sheriff's Department policy was, but that is somewhat inconsistent with his saying that he did this, he did consistently, and the reason he did it is because his

8

superiors had always told him to do that.  I find that that is sufficient in terms of a policy requirement for the inventory search.

I also find that although the driver was physically present, he was not present in terms of being able to make arrangements for this vehicle to leave the scene. The officers acted properly in not permitting a vehicle that was not insured, based on the information that they had at the scene, whose owner was not available and which vehicle did not have a proper registration to leave the scene.  And so I find that that criteria has also been met.

The valuables in plain sight, I find based on the testimony that the officers, after the vehicle was impounded, saw items in the car that led to their doing an inventory search as testified to by the officer to ensure that if the car was in fact towed, that there was a list that not only protected the owner of the property but also protected the police department from any allegation that things were taken from the vehicle.

I find -- I disagree, Mr. Dickinson, I do not believe that the law is such that a chain of custody of items has to be established at a suppression hearing.  I find that that chain of custody is an issue for admission into evidence which is not a constitutional issue or other suppression issue; that the State would be required to show chain of custody before items can be admitted into evidence at the trial; and I will require that, but I do not believe that its necessary by virtue of the case law for that to be established at a suppression hearing.

(# 31, Ex. 8 at 183-188).

Before Petitioner's second trial (which is the subject of this habeas corpus petition), Petitioner's counsel renewed his motion to suppress all of the evidence seized from Petitioner's truck.  The trial court incorporated its prior rulings.  (Id.)

<u>State's case in chief</u>

At Petitioner's second trial, Cecilia Lanham testified for the State.  She stated that she was working at the Go-Mart in Cross Lanes, West Virginia on June 14, 2003.  She indicated that Petitioner had purchased some matches and two bottles of Heet from the store that day, but she also observed Petitioner take additional boxes of matches that he had not paid for.  Thus, she called the police.  Deputy D. W. Hylton responded to the call.  (# 31, Ex. 8 at 196-197).  The Go-Mart was equipped with surveillance cameras.  Ms. Lanham was able to show Deputy Hylton the person who stole the matches on the camera footage.  (<u>Id.</u> at 198).

Ms. Lanham further testified that Petitioner returned to the store a few days later.  At that time, Ms. Lanham observed that Petitioner was driving a two-toned, burgundy S-10 pickup truck, and she obtained the license plate number off of the truck.  (<u>Id.</u> at 198-199).  Ms. Lanham subsequently provided this information, and some photos that were taken from the surveillance camera to Deputy Hylton.  Ms. Lanham identified the photographs she had given to Deputy Hylton and also made an in-court identification of Petitioner as the person she had witnessed stealing the matches at the Go-Mart.  (<u>Id.</u> at 199-200).

The jury was given a limiting instruction concerning the testimony about Petitioner's alleged shoplifting of the matches. The trial court instructed the jury as follows:

> Ladies and gentlemen of the jury, you've heard some
> testimony from Ms. Lanham and this witness [Deputy
> Hylton] regarding the shoplifting of some matches.  I
> want you to know that that is not to be  -- you are not
> to concern yourself with the guilt or innocence of any
> shoplifting charge.  That testimony is being offered to
> you for your use given how the police had a description
> of the defendant and his vehicle.  You are not to concern
> yourself with the guilt or innocence of this gentleman on
> the shoplifting, and you are not to use that in and of
> itself as grounds for finding him either guilty or not
> guilty of the charge for which he stands on trial here
> today.

(Id. at 206-207).

Deputy Hylton also testified for the State at Petitioner's trial.  Deputy Hylton stated that Ms. Lanham initially reported to him that the shoplifting suspect was driving a '90's model Chevy S-10 Blazer and gave him a license plate number that did not register for any type of vehicle in the DMV files.  (Id. at 208).  However, Ms. Lanham contacted Deputy Hylton a second time, after she saw the suspect in the Go-Mart again, and she gave him a license plate number that came back as being registered to a John Keith Caldwell, III, at a Putnam County, West Virginia address.

Deputy Lanham asked the Putnam County Sheriff's Department to have an officer drive by the address where the truck was registered and see if the vehicle was there, but it was never located there. (Id. at 209-210).  Deputy Hylton testified that he made some notes about the vehicle and typed up a supplemental report, but nothing more was done at that time.  (Id. at 210).

11

On December 29, 2003, however, Deputy Hylton was traveling on Big Tyler Road in Cross Lanes, West Virginia, when he saw a vehicle that matched the description of the vehicle given by Ms. Lanham and had the same license plate number. (<u>Id.</u> at 210-211). At that time, Deputy Hylton initiated a traffic stop of the suspect vehicle.

The driver of the truck, who appeared to be the same person as in the Go-Mart surveillance camera photographs, stated that his name was Robert Edward Edwards, but he did not produce a driver's license, or the registration or proof of insurance for the truck. (<u>Id.</u> at 211-212). Deputy Hylton could not find any information about such an individual in any West Virginia databases. (<u>Id.</u>) The driver indicated that he had also lived in Florida, but the databases did not turn up any matching information in either state. (<u>Id.</u>)

By that time, several other officers had arrived at the scene. Deputy Hylton stated that he spoke with his supervisor and advised him of the circumstances. Deputy Hylton was instructed to arrest the driver, which he did. (<u>Id.</u> at 214-215). The officers further determined that they should impound the vehicle, as the registered owner was not present, and the vehicle was not properly licensed or insured. (<u>Id.</u> at 215-216).

As Deputy Hylton placed the driver under arrest, the other officers began an inventory search of the vehicle. During the

12

search, a driver's license was found that identified the driver of the truck as Petitioner, Robert Edward Dickerson.  (Id. at 216). Deputy Hylton also made an in-court identification of Petitioner as the driver of the truck he stopped.  (Id. at 216-217).

The inventory search of the truck led to the discovery of items that the officers believed were related to the manufacturing of methamphetamine.   Those items included ten caplets of Contac cold medicine, sixteen caplets of Contac severe cold and flu medicine, three boxes which each contained twenty caplets of maximum strength Dimetapp, a container with one hundred and twenty red tab pills, a lighter, a burn hemostat, a small spoon, small scales, a Wal-Mart receipt, two butane torches, two butane glass containers, a Ronson butane fuel container, plastic tubing and a cap, a can of Zippo lighter fluid, a small beaker, and a film cannister containing a baggie of brown powder.  (Id. at 286-290).

Petitioner was charged with driving on a suspended license, the operation or attempted operation of a clandestine drug laboratory, as well as petit larceny, and obstruction of justice, for giving the wrong name.  (Id. at 219-220).

One of the items that was located in the truck that Petitioner was driving was a plastic baggie containing a brown powder.  The powder tested positive for methamphetamine and amphetamine.  Deputy Hylton did not include the discovery of this item in his police report.   On  cross-examination,  Petitioner's  counsel,  Eugene

Dickinson, questioned Deputy Hylton about his training to do investigations and write reports. Deputy Hylton stated that he forgot to put the powder in his report. (Id. at 240).

The State also called Sergeant E. S. Drennen as a witness. Sergeant Drennen was one of the other officers who responded to the scene of Petitioner's traffic stop, and he assisted with the inventory search and seizure of the items from the truck. Sergeant Drennen identified each of the State's exhibits 6 through 35, as items that had been seized from the truck Petitioner was driving. (Id. at 246-259). Sergeant Drennen testified that each of these items was photographed, bagged and transported to the Kanawha County Sheriff's Department Headquarters in Charleston, where they were placed in an evidence locker. (Id. at 259-260).

On cross-examination, Sergeant Drennen was asked about prior testimony he had given in which he had stated that the film cannister had contained pills, not the brown powder. (Id. at 261-263). In his testimony before the grand jury, Sergeant Drennen did not mention the brown powder as an item that had been found in the truck. On re-direct examination, Sergeant Drennen stated that he had been testifying from Deputy Hylton's report and did not catch that it did not mention the brown powder, but reiterated that he did seize the powder from the truck. (Id. at 269-271). Sergeant Drennen also stated that the photographs of the evidence that were

taken at the scene of Petitioner's arrest were missing.[3]  (Id. at 263-264).

    The State also called Deputy Charles M. Morgan and Lieutenant R. J. Flint as witnesses.  Deputy Morgan also assisted with the search and seizure of items from the truck Petitioner was driving.  (Id. at 273-281).  Lieutenant Flint testified that he was the property officer at the Sheriff's Department and was the only person with access to the lockers where evidence was stored after officers deposited items therein.  He testified about the procedures for holding evidence and the chain of custody of the specific evidence in question in Petitioner's case.  (Id. at 282-304).

    The State also offered the testimony of two expert witnesses.  Deputy Anthony L. Pauley testified about his training in the manufacturing and use of methamphetamine and how to recognize or identify clandestine meth labs.  (Id. at 306-344).  In particular, Deputy Pauley testified about the steps involved in manufacturing methamphetamine using the "red phosphorus" or "red P" method.  (Id. at 311-315).  Deputy Pauley opined that a number of the items found in the truck Petitioner was driving are consistent with the manufacture of methamphetamine.  (Id. at 315-320).

---

[3]    Apparently, additional photographs were taken when the evidence was brought to the police headquarters.  Those photographs were introduced by the State at trial.

On cross-examination, Mr. Dickinson questioned Deputy Pauley about other methods of making methamphetamine, and about certain other chemicals that were needed to make methamphetamine, which were not found in the truck that Petitioner was driving. (Id. at 322-339). Deputy Pauley stated that Petitioner did not have all of the ingredients needed to manufacture methamphetamine at that time. (Id. at 339). Deputy Pauley also acknowledged that the items found in the truck could be used for smoking methamphetamine, but he had never seen that done. (Id. at 340-342).

Carrie Kirkpatrick also testified as an expert witness for the State. Ms. Kirkpatrick was employed as a senior forensic chemist at the West Virginia State Police forensic laboratory in the Drug Identification Section. (Id. at 347). Ms. Kirkpatrick was qualified as an expert in the field of identification of drugs, the manufacture of methamphetamine, and the identification of clandestine meth labs. (Id. at 351).

Ms. Kirkpatrick testified about her testing and analysis of the tablets and powder that were seized from the truck Petitioner was driving. (Id. at 352-360). The tablets weighed a total of 19.6 grams and contained pseudoephedrine. (Id. at 357). The brown powder proved to contain methamphetamine and amphetamine. (Id. at 359).

Ms. Kirkpatrick also testified about her knowledge of how to manufacture methamphetamine, and where the necessary items can be

16

purchased.  (Id. at 360-368).  Ms. Kirkpatrick also opined that the items found in the truck were consistent with the manufacturing of methamphetamine.  (Id. at 368-369).  Ms. Kirkpatrick was also cross-examined about items necessary to make methamphetamine which were not present in the evidence seized from Petitioner's truck, as well as other items that were found in the truck that are unrelated to the manufacture of methamphetamine.  (Id. at 372-388).  Ms. Kirkpatrick acknowledged that the cold pills were still intact, that there was no evidence to confirm that any of the items in the truck had actually been used to make methamphetamine, and that there was no way to determine when or where the finished product (the brown powder) that was found in the truck was manufactured. (Id. at 393-394).

<u>Petitioner's case in chief</u>

Petitioner was the only defense witness.  Petitioner admitted that he was addicted to methamphetamine and that the items in the truck were his, but he told the jury that he used the items to smoke methamphetamine, not to make it.  Petitioner demonstrated for the jury how some of the items could be used to smoke methamphetamine.  (Id. at 407-421).  Petitioner further testified that he had smoked methamphetamine just a few minutes before he got pulled over by Deputy Hylton.  (Id. at 420-421).  Petitioner did not testify as to why he was in possession of such a large amount of cold medication.

17

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but

18

unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## **ANALYSIS**

### **A.   Grounds One, Two and Three - Failure to properly instruct the jury.**

The first three grounds for relief in Petitioner's section 2254 petition all concern claims that the jury was not properly instructed, which Petitioner alleges resulted in the denial of his due process rights.  The undersigned will address each ground for relief in turn.

In Ground One of his federal petition, Petitioner asserts that he was denied due process of law because the trial court refused to give Defendant's proposed jury instruction # 1 to the jury.  The proposed instruction reads as follows:

> The offense charged in this indictment is the operation or attempted operation of a clandestine drug laboratory.  A "clandestine drug laboratory" means any property, real or personal, on or in which a person assembles any chemicals or equipment or combination thereof for the purpose of manufacturing methamphetamine.
>
> The State must prove beyond a reasonable doubt that the defendant operated or attempted to operate a clandestine drug laboratory.  You are instructed that the mere assembly of any chemicals or equipment for the purpose of manufacturing methamphetamine does not constitute the crime of operation of a clandestine drug laboratory.  If you find that the Defendant merely possessed or assembled chemicals or equipment or a combination thereof on or in any property, real or personal, for the purpose of manufacturing methamphetamine, you must find the Defendant not guilty.
>
> Likewise, the mere assembly of any chemicals or equipment for the purpose of manufacturing methamphetamine does not constitute the crime of attempt to operate a clandestine drug laboratory.  In order to constitute the crime of attempt, two requirements must be met: (1) a specific intent to commit the underlying substantive crime; and (2) an overt act toward the commission of that crime, which falls short of completing the underlying crime.
>
> You are instructed that if you find the Defendant assembled chemicals or equipment or a combination thereof on or in any property, real or personal, for the purpose of manufacturing methamphetamine, but that the Defendant committed no overt act in the manufacturing process itself, you must find the Defendant not guilty.

(# 2, Attach. # 1 at 1).

Petitioner asserts that this instruction is a correct statement of the law, and that it was necessary because it defines the essential element of "attempt," which was not covered in the charge given to the jury. Petitioner further contends that the essential element of attempt requires an overt act toward the completion of the crime. (# 3 at 5-8).

In Ground Two of his federal petition, Petitioner again contends that the trial court erred by not instructing the jury as to the essential elements of the crime; specifically the meaning of "operate" and "attempt to operate." (Id. at 9-10). Petitioner notes that, during the jury deliberations, the jury sent a note to the trial judge which stated, "[i]s 'operate' or 'attempt to operate' defined? If so, what are their definitions?" (Id. at 9). Petitioner further asserts that the trial court's refusal to provide the jury with definitions of these terms denied him due process of law. (Id.)

In Ground Three of his federal petition, Petitioner contends that the instructions that were given to the jury were confusing, misleading, and allowed the jury to presume the element of "attempt." (Id. at 11-15). Petitioner's argument in this ground for relief aptly summarizes his claims in Grounds One through Three. He states:

> However, with absolutely no instruction given to the jury by the trial court as to the meaning or definition of [the] essential elements, "operate" or "attempt to operate" on (Page 10), of the "Judge's Charge to the

21

Jury," the trial court gives instructions which are almost word for word repeat of the State's arguments. ". . . and prove to your satisfaction beyond a reasonable doubt that:

1) Robert Dickerson
2) in Kanawha County
3) on or about the 29th day of Dec. 2003
4) did operate or attempt to operate
5) a clandestine drug lab
6) in which he did assemble
7) any chemicals or equipment or combination thereof
8) in or on any real or personal property
9) for the purpose of manufacturing methamphetamine"

With no instruction given to the jury as to the meaning of the crime, "the 'operation' or attempted operation' of a clandestine drug laboratory," the jury was confused by the court's instruction.  As is most evident from the note sent by the jury during deliberation (Tr. Trns. 472) "Is 'operate' or 'attempt to operate' defined?  If so, what are their definitions?"

And further, since the instructions given on (PG 10) were a near word for word repeat of the State's arguments at closing, there was an extreme potential for the jury to be mislead . . . . [T]hese instructions as given could potentially mislead the jury to conclude that the State had proven its case.

* * *

Instead of defining the criminal behavior which is needed to convict, the trial court instead gave the definition of what a clandestine drug lab is.

* * *

This affected the truth finding process and substantially affected Mr. Dickerson's constitutional and due process rights to a fair and impartial trial.  In that, a jury could conclude by presumption that Mr. Dickerson was guilty of a crime which by law must contain an overt act or substantial step, when there was absolutely no evidence or testimony even offered by the State of such an act or step.

22

In allowing this, a complete miscarriage of justice
did in fact occur.

(Id. at 12-15).

Respondent's Memorandum of Law in support of her Motion for
Summary Judgment asserts that Petitioner's claim in Grounds One and
Two, concerning the instructions given to the jury and the failure
to give Defendant's Instruction No. 1, involve a state court's
interpretation of a state statute and, thus, his claims are not
cognizable in federal habeas corpus.   Respondent states:

> Although the Petitioner claims that his federal due
> process right to a "fully instructed jury" was violated,
> this Court could not make such a finding unless it
> substituted its judgment for the state trial court's as
> to the elements of the state offense.   See Engle v.
> Isaac, 456 U.S. 107, 119 (1982)(Insofar as a petitioner
> challenges the correctness of an application of state law
> without alleging a deprivation of a federal right, he may
> not obtain habeas relief.)  "A 'mere error of state law'
> is not a denial of due process."  Id. at 121 n.21.

(# 32 at 12-13).   Respondent further asserts that the trial court
properly rejected Defendant's Instruction No. 1 because it is an
improper statement of state law.   Respondent also notes that,
subsequent to Petitioner's conviction, the SCAWV issued an opinion
exactly on point with Petitioner's claims concerning the failure of
the jury instructions to define "attempt."

In State v. Jett, 647 S.E.2d 725 (W. Va. 2007), the appellant,
Eric Delbert Jett, was convicted in the Circuit Court of Kanawha
County of the same crime as Petitioner; that is, operating or
attempting to operate a clandestine drug laboratory.   In his direct

23

appeal, Jett asserted, similar to Petitioner herein, that the circuit court committed reversible error by refusing to give the appellant's requested jury instruction defining the term "attempt." Jett's proposed instruction mirrored Petitioner's proposed instruction concerning the requirement of taking an "overt act" toward the commission of the crime, and that the "mere assembly of any chemicals or equipment for the purpose of manufacturing methamphetamine does not constitute the crime of attempt to operate a clandestine drug laboratory." The SCAWV affirmed Jett's conviction, finding as follows:

> The sole assignment of error raised by the appellant is that the trial court committed reversible error by refusing to give the appellant's requested instruction defining "attempt." In support of this assigned error, the appellant first argues that the word "attempt" is a term of art that must be defined for the jury. According to the appellant, absent the proper definition of "attempt," the jury could not properly hold the State to its burden of proving every essential element beyond a reasonable doubt.
>
> Under our law, "[a] term which is widely used and which is readily comprehensible to the average person without further definition or refinement need not have a defining instruction." Syllabus Point 2, <u>State v. Bartlett</u>, 177 W. Va. 663, 355 S.E.2d 913 (1987). We believe that "attempt" is such a term.
>
> * * *
>
> In the instant case, we find that the word "attempt" as used by the trial court in its instruction to the jury is a common term which is widely used and generally understandable to the average person. Thus, we believe it is unlikely that the jury below was confused by the term so as to affect its verdict against the appellant. Therefore, we conclude that the trial court's failure to provide a definition for the term in its charge to the

jury was not error.

The appellant also contends that the instruction given by the trial court had the potential to mislead the jury into believing that the mere assembly of chemicals and equipment on real or personal property for the purposes of manufacturing methamphetamine was sufficient for conviction.

Generally, "[a]n instruction for a statutory offense is sufficient if it adopts and follows the language of the statute, or uses substantially equivalent language and plainly informs the jury of the particular offense for which the defendant is charged." Syllabus Point 8, State v. Slie, 158 W. Va. 672, 213 S.E.2d 109 (1975). As set forth above, the trial court below instructed the jury that before the appellant can be found guilty of the crime charged, the State must prove beyond a reasonable doubt that (1) the appellant, (2) in Kanawha County, West Virginia, (3) on or about the 23rd day of June 2004, (4) did operate or attempt to operate, (5) a clandestine drug laboratory, (6) in which he did assemble, (7) chemicals or equipment or a combination thereof, (8) in or on any real or personal property, (9) for the purpose of manufacturing methamphetamine.

Clearly, the trial court's instruction adopted the language of W. Va. Code § 60A-4-411, and plainly informed the jury of the particular offense for which the appellant was charged. Thus, the instruction was a correct statement of the law. Accordingly, we find no error in the trial court's instruction to the jury on the elements of operating or attempting to operate a clandestine drug laboratory.

Finally, the appellant avers that his proffered instruction was a correct statement of the law, that it was not substantively covered in the trial court's charge, and it covered an important point in the trial that was central to the appellant's presentation of an effective defense. Therefore, the appellant posits that it was reversible error for the trial court to refuse to give the instruction.

* * * We find that the appellant's proffered instruction is not substantively correct. The instruction indicates that the crime of attempt requires an overt act toward the commission of the crime in the manufacturing process

itself, beyond the assembly of chemicals or equipment for the purpose of manufacturing methamphetamine. This is incorrect. According to the plain language of W. Va. Code § 60A-4-411, the State is required to show as an overt act only that the defendant assembled chemicals or equipment or a combination thereof in or on any real or personal property for the purpose of manufacturing methamphetamine. In other words, in order to show attempt to operate a clandestine drug laboratory, no overt act other than the assembly of the chemicals or equipment indicated by the statute is required. Therefore, the circuit court did not abuse its discretion in refusing to give the appellant's requested instruction.

647 S.E.2d at 729-731.

Petitioner's Response to Respondent's Motion for Summary Judgment is largely repetitive of the arguments made in Grounds One through Three contained in his federal petition. (# 34). One further argument made by Petitioner in his Response asserts that the alleged instructional error made by the trial court for not instructing the jury concerning the essential element of "attempt" is contrary to, or involved an unreasonable application of, federal law merely because Petitioner asserted that his rights to due process and a fair trial were violated.

Petitioner further maintains that federal law requires the proof of a substantial step toward the commission of the crime in order to be convicted of attempting to manufacture methamphetamine. Petitioner cites to <u>United States v. Smith</u>, 264 F.3d 1012 (10th Cir. 2001), a case decided by the Tenth Circuit Court of Appeals concerning a defendant's conviction for attempting to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2). In that

case, the Tenth Circuit noted that, to be convicted of that offense, the government must show "(1) intent to manufacture methamphetamine, and (2) commission of an act which constitutes a substantial step towards commission of the substantive offense." Id. at 1015-1016 (citations omitted).  (# 34 at 8).

What Petitioner fails to realize is that Smith was convicted pursuant to a federal statute that has absolutely no application to the state statute under which Petitioner was convicted. Furthermore, the SCAWV addressed these exact same claims in the Jett case and found against the appellant/petitioner therein. Thus, Petitioner's claims are clearly a challenge to the state court's interpretation of a state statute, and such a challenge is not cognizable in federal habeas corpus.

> It is black letter law that a federal court may grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(West Supp. 1998); see also Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991)(emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.").  Because Wright's claim, when pared down to its core, rests solely upon an interpretation of Virginia's case law and statutes, it is simply not cognizable on federal habeas review.  See Smith v. Moore, 137 F.3d 808, 822 (4th Cir. 1998)(refusing to entertain claim that jury instruction misstated South Carolina law).

Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998).

27

The fact that Petitioner has asserted that the alleged instructional error violated his rights to due process and a fair trial do not change this proposed finding.  The <u>Jett</u> court's decision makes it apparent that Petitioner's jury was not improperly instructed, and therefore Petitioner suffered no undue prejudice.  Moreover, as also noted by the <u>Jett</u> court, the jury could have found that the assembly of the chemicals and equipment in the truck Petitioner was driving was an overt act toward the commission of the crime of operating a clandestine drug laboratory. 647 S.E.2d at 731 ("no overt act other than the assembly of the chemicals or equipment indicated by the statute is required.") Therefore, Petitioner has not demonstrated that his trial was fundamentally unfair under West Virginia law and, thus, he cannot show a violation of his federal constitutional rights, because there was no prejudicial error.

Petitioner raised these grounds in his direct appeal, which was summarily refused.  Furthermore, the state habeas court found that "the jury was properly instructed given the language of the statute," and denied Petitioner's request for habeas corpus relief on the basis of instructional errors.  (# 31, Ex. 6 at 1-2).  Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' decisions were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is

entitled to judgment as a matter of law on Grounds One, Two and Three of Petitioner's federal petition.

**B.    Ground Four - Sufficiency of evidence.**

In Ground Four of his federal petition, Petitioner asserts that the evidence presented at his trial was insufficient to support a conviction for "operating or attempting to operate a clandestine drug lab," because there was no evidence or testimony concerning an overt act toward the operation of such a lab.  (# 3 at 16).  Again, Petitioner's argument rests on his belief that the jury had to find that Petitioner committed an over act or took a substantial step towards the commission of the crime, other than just the assembly of chemicals and/or equipment, in order to be found guilty of the crime of "attempt."  Petitioner adds:

> A review of the records in this case will clearly show that there was absolutely no evidence or testimony even offered by the State that Mr. Dickerson did anything more, than have in his possession, a few items which <u>could possibly</u> be used to manufacture methamphetamine, (all of which are common household products, & none of which are illegal to purchase over the counter).  The State then asks the jury to conclude that by merely having items which could possibly be used to manufacture methamphetamine in his vehicle, Mr. Dickerson is guilty of an attempt to operate.

> The only item deemed as a possible ingredient by the State's expert witness was the cold pills (a possible source of pseudoephedrine).  There was a small 7 oz. can of Zippo lighter fluid & some small cans of butane lighter fluid (possible heat source), as well as a small mini torch & a flask (possible equipment), that could be used to manufacture.

> It was Mr. Dickerson's testimony that this "so called" (possible equipment), was in fact for smoking

methamphetamine & not for making it.  Mr. Dickerson also stated that the cold pills were left in the truck by a friend.  However, this was the only evidence produced by the State, & there was no evidence of an "attempt to operate," as is required by law to convict.

(<u>Id.</u> at 16-17).

Respondent's Memorandum of Law concerning this claim begins by discussing the applicable standard of review by a federal court of the sufficiency of evidence in a state criminal proceeding.  In reviewing the sufficiency of the evidence to support a state criminal conviction on a due process challenge in a federal habeas proceeding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  (# 32 at 15-16).  As further noted by Respondent, the court does not re-try the evidence or re-determine the credibility of the witnesses.  <u>See</u> <u>Wright v. West</u>, 505 U.S. 277, 296 (1992); <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434 (1983).  (<u>Id.</u>)

Respondent again asserts that Petitioner's challenge to the state court's interpretation of the state statute under which he was convicted is not cognizable in federal habeas corpus.  (<u>Id.</u> at 16-17).  However, Respondent also states that, "the State adduced enough evidence to support Petitioner's conviction."  (<u>Id.</u> at 17).  Respondent then summarizes the evidence presented by the State.

Respondent states, inter alia:

> In the case at bar, the Petitioner shoplifted an
> unusually large amount of matches from a local
> convenience store.  He also purchased Heet, a product
> used in the production of methamphetamine.  Seven months
> later Deputy Hylton pulled him over in the same truck.
> The Petitioner could not produce a driver's license,
> registration or proof of insurance.  He gave the officer
> a false name.  When his information did not check out, he
> lied to Deputy Hylton again.  Until he was confronted
> with his own driver's license, he continued to deny his
> true identity.  " A trial court may admit [e]vidence that
> an accused has taken some kind of evasive action to avoid
> detection for a crime, such as flight, concealment of
> evidence, or a false statement, [which] is ordinarily the
> basis for a charge on the inference of consciousness of
> guilt." State v. Jimenez, 810 A.2d 848, 860 (Ct. 2002);
> Welch v. Commonwealth, 425 S.E.2d 101, 106 (Va.
> 1992)(assumption of false name admissible as evidence of
> consciousness of guilt and guilt itself).

> A search of the truck found a closed toolbox
> containing chemicals and other materials used to
> manufacture methamphetamine, in addition to a small
> amount of finished product. [FN 9 - A reasonable juror
> could infer that the finished product was cooked by the
> Petitioner, who has dismantled his lab and was planning
> to relocate.] These items were not new, or recently
> purchased.  Although they may have alternate uses, they
> are household items not ordinarily carried around inside
> a truck.  The items were not gathered randomly, each
> served a purpose in the manufacturing process.  They were
> not looked upon as separate, unconnected items.  The jury
> reasonably considered the totality of the circumstances;
> thus, coming to the reasonable conclusion that the
> Petitioner was either operating or attempting to operate
> a clandestine drug lab.

(Id. at 21-22).

Petitioner's Response contends that the State habeas court's

decision denying habeas corpus relief on this claim was "based on

an unreasonable determination of the facts in light of the evidence

presented in the state court's proceedings.   Therefore the

31

respondent's request for summary judgment should be denied." (# 34

at 17).  Petitioner also attempts to distinguish his case from the

Jett case decided by the SCAWV.  Petitioner states:

> One such difference is the fact that the jury in
> this case made the trial court aware that they did not
> understand the meaning of "attempt" as it is written in
> this case. (Tr. Trans. 472).  "Is operate or attempt to
> operate defined?  Idf so, what are their definitions?"
>
> It should also be considered that Mr. Dickerson was
> the first person to stand trial for this newly created
> law & unlike the case of Jett, Mr. Dickerson has never
> once claimed to have manufactured methamphetamine.
>
> The Respondent's argument contains comments made by
> the State's expert witness, Ms. Carrie Kirkpatrick,
> stating that the items listed as evidence, "were
> consistent with the manufacture of methamphetamine."
> However, this same witness also said, out of the 35 items
> listed, only the cold pills are an ingredient (a possible
> source of pseudoephedrine).
>
> Although Ms. Kirkpatrick said that the mini torch &
> flask could be used to manufacture methamphetamine, she
> also said there was no evidence that Mr. Dickerson was
> engaged in such an act.
>
> * * *
>
> The State in this case offered evidence & testimony
> that would show Mr. Dickerson was possibly in possession
> of a few items which could be used to manufacture
> methamphetamine.   There was absolutely no evidence
> offered & not one word of testimony that would suggest
> anything beyond the possession of these items.  In order
> to convict Mr. Dickerson of the crime charged the State
> must prove at the very least, an "attempt" to operate
> such a lab as it is defined by the Legislature in
> (Section B), as "any property, real or personal, on or in
> which a person assembles any chemical or equipment for
> the purpose of manufacturing."

(Id. at 17-19).  In support of his argument that the State must

prove an "overt act" or "substantial step" beyond the assembly of

chemicals and/or equipment used in the manufacturing of methamphetamine, Petitioner again relies on cases concerning convictions under the federal statute, 21 U.S.C. § 841, which is inapplicable to the case at bar. (Id. at 20-22).

As noted by the SCAWV in Jett, the assembly of any chemicals and/or equipment for the purpose of manufacturing methamphetamine could be construed as an overt act toward the commission of the crime of operating or attempting to operate a clandestine drug laboratory. See Jett, 647 S.E.2d at 731 ("In other words, in order to show attempt to operate a clandestine drug laboratory, no overt act other than the assembly of the chemicals or equipment indicated by the statute is required.") It is not the province of this federal court to re-weigh the evidence or credibility of the witnesses. The jury heard Petitioner's testimony that he used the equipment found in the truck to smoke methamphetamine, not to make it, and that someone else had left the large amount of cold medicine in the truck, and clearly chose not to believe it.

The state habeas court found that:

> Furthermore, given the testimony of Sgt. Drennen, Deputy Hylton and chemist Carrie Kirkpatrick, the Court finds that sufficient evidence was submitted to support the jury's verdict. Specifically, the Court finds that the items located in the Petitioner's possession, including methamphetamine, were sufficient to support the jury's finding.

(# 31, Ex. 6 at 2).

33

The undersigned proposes that the presiding District Judge **FIND** that the evidence presented to the jury, taken in the light most favorable to the prosecution, was clearly sufficient for a rational trier of fact to find Petitioner guilty, beyond a reasonable doubt, of the crime of operating or attempting to operate a clandestine drug laboratory under West Virginia law. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**C.   Grounds Five and Six - Admission of exhibits at trial.**

Grounds Five and Six of Petitioner's federal petition both concern the alleged improper admission of exhibits at trial.   In Ground Five, Petitioner contends that the trial court improperly admitted Exhibit # 35, the brown powder that was allegedly found in the truck that Petitioner was driving, because the State failed to properly establish the chain of custody concerning that evidence, and the investigating officer failed to include it in his police report.   (# 3 at 21-24).

In Ground Six, Petitioner contends that the trial court erred by denying Petitioner's Motion to Suppress Exhibits 6 through 35, which consisted of the items found in the truck.   Petitioner again

bases this argument on the State's alleged failure to properly establish a chain of custody for these items, and further asserts that the items were seized during an unlawful search. (Id. at 25-36).

Respondent's Memorandum of Law in support of her Motion for Summary Judgment asserts that Petitioner's claims concerning the chain of custody are not cognizable in federal habeas corpus because they are grounded in state evidentiary law. Respondent states, "[b]reaks in the chain of custody go to the weight of the evidence, not its admissibility." United States v. Morrison, 153 F.3d 34, 57 (2d Cir. 1998); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Kelly v. Withrow, 25 F.3d 363, 370 (6th Cir. 1994)(errors by state court in admission of evidence not cognizable unless defendant has been denied a fair trial). (# 32 at 22). Respondent then addresses whether the admission of the brown powder and other exhibits denied Petitioner a fair trial. (Id. at 22-27).

At trial, Deputy Hylton testified that he listed the evidence seized by the other officers in his police report, and that he forgot to list the brown powder therein. (# 31, Ex. 8 at 240). He further stated that he saw the powder, and that he subsequently listed it in his criminal complaint to the magistrate. (Id. at 238, 240). Respondent further notes that Sergeant Drennen testified that the brown powder was located in a film cannister that was taken out of the truck that Petitioner was driving, and

that, at trial, it appeared in the same condition as at the time of the seizure.  He further testified that the brown powder and film cannister were placed in a brown bag that was marked, "one small bag of meth in a film cannister, dated 12/29/03."  (Id. at 221, 256.)

Lieutenant R. J. Flint, the officer in charge of the evidence room, testified that evidence may either be handed to him by an investigating officer, or it may be locked in an evidence locker, which is secured by either traditional locks or push button locks. Lieutenant Flint further stated that he is the only person who has access to those lockers.  (Id. at 283).  Lieutenant Flint further testified that, on December 30, 2003, he reviewed the evidence lockers for new materials, and began to enter those items into his computer the next day.  (Id. at 284).  Items pertaining to this case were placed in one evidence locker and the Lieutenant Flint's list noted the receipt of each item.  (Id. at 286-290).  Thus, the chain of custody was established.

Moreover, to the extent that Petitioner has challenged the admission of these exhibits based on an allegedly unlawful search of the truck, Respondent asserts that Petitioner was provided a full and fair opportunity to litigate that claim when the trial court had an evidentiary hearing on Petitioner's Motion to Suppress before his first trial.  (# 32 at 27).  As noted by Respondent, "[w]here the State has provided an opportunity for a full and fair

litigation for a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search and seizure was introduced at trial." <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976). (<u>Id.</u>)

A review of the transcripts in the record before this court indicate that Petitioner's challenges to the lawfulness of the search of the truck and the seizure of the evidence therein were fully and fairly litigated by the trial court before Petitioner's trial.  Furthermore, the state habeas court found that "[t]he officers had probable cause to search Defendant's vehicle and conduct an inventory search."  (# 31, Ex. 6 at 2).  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's claims contained in Grounds Five and Six of his federal petition are not cognizable in federal habeas corpus, and that Respondent is entitled to judgment as a matter of law on those grounds for relief.

### D.   Ground Seven - cumulative error.

In Ground Seven of his federal petition, Petitioner states, "the trial court was incompetent, by rulings of the West Virginia Supreme Court of Appeals as well as the federal courts of the United States, by color code & conduct of the law." (# 3 at 37). Petitioner then rehashes the various errors he believes that trial court made, as previously addressed in other grounds in his federal

37

petition, and asserts that these errors violated his due process and other constitutional rights, and resulted in a miscarriage of justice.  (Id. at 37-42).

The undersigned construes Petitioner's allegations in Ground Seven of his federal petition to be asserting a claim of cumulative error.  However, Petitioner has not shown how any trial errors, individually or cumulatively, deprived him of a federal constitutional right; nor has Petitioner specified any clearly-established Supreme Court precedent holding that cumulative trial errors which have not been shown to have had a "substantial and injurious effect or influence in determining the jury's verdict" can form the basis for federal habeas relief.

In Fisher v. Angeleone, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error . . . ."  Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.

Petitioner's claim of cumulative error stems from claims which the court has previously found to be non-errors.  Because the court has already found that there were no violations of Petitioner's federal constitutional rights, to the extent that Petitioner raises (as a basis for cumulative error) claims already addressed by the court, those claims lack merit as well.

The court proposes that the presiding District Judge **FIND** that Petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by Petitioner in his federal petition, and that the state courts' decisions were neither contrary to, nor an unreasonable application of, clearly established federal law.   Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this ground for relief.

### RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 8) and dismiss this civil action from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge.   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.   Extension of

this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on the opposing party, Judge Faber and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

<u>December 9, 2008</u>
Date

Mary E. Stanley
United States Magistrate Judge